**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| VLADIMIR GUSINSKY REVOCABLE TRUST, Derivatively on Behalf of WALGREENS BOOTS ALLIANCE, INC, <br><br> Plaintiff, <br><br> v. <br><br> STEFANO PESSINA, JOSE E. ALMEIDA, JANICE M. BABIAK, DAVID J. BRAILER, WILLIAM C. FOOTE, GINGER L. GRAHAM, JOHN A. LEDERER, DOMINIC MURPHY, LEONARD D. SCHAEFFER, NANCY M. SCHLICHTING, and JAMES A. SKINNER <br><br> Defendants, <br> and <br><br> WALGREENS BOOTS ALLIANCE, INC., a Delaware Corporation <br><br> Nominal Defendant | Case No. 23-cv-15654 |

## <u>VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff the Vladimir Gusinsky Revocable Trust ("Plaintiff"), derivatively on behalf of

Walgreens Boots Alliance, Inc. ("Walgreens" or the "Company"), brings this Verified Stockholder

Derivative Complaint (the "Complaint"), asserting breach of fiduciary duty, unjust enrichment,

and violations of the federal securities laws against the Company's current and former officers and

directors. The allegations are based on Plaintiff's knowledge as to itself, and on information and

belief, including counsel's proprietary investigation and review of publicly available information.

1

## I.   INTRODUCTION

1.      The United States is in the grips of the deadliest drug epidemic in its history. The opioid epidemic takes many forms – from illegal narcotics to those prescribed by licensed physicians.  In 2019 alone, nearly 50,000 people died from an opioid overdose in the United States.[1] And according to the U.S. Department of Health and Human Services, an estimated 40% of opioid overdose deaths involved a ***prescription*** opioid. In recent years, prescription painkillers have been responsible for more deaths than all illegal street drugs, cocaine, heroin, and amphetamines ***combined***. Oxycodone is a Schedule II ("C-II") opioid narcotic used as a prescription painkiller to control moderate-to-severe pain, chronic pain, pain related to cancer, and other debilitating and terminal conditions. The Drug Enforcement Agency ("DEA") warns on its website that "[o]xycodone is a powerful addictive narcotic that is one of the most abused prescription medications… throughout the United States."

2.      At the center of regulatory efforts to address the crisis are the pharmacies which distribute these drugs and who have an affirmative obligation under the law to ensure the prescriptions they fill are legitimate and report suspicious orders to the authorities.  Walgreens is the largest pharmacy chain in the United States.  As the *Washington Post* reported on November 7, 2019, "[a]t the height of the opioid epidemic, Walgreens handled nearly one out of every five oxycodone, and hydrocodone pills shipped to pharmacies across America."

3.      As detailed herein, Walgreens has a long and undistinguished record with regulatory agencies, including the DEA. The DEA sent letters to all distributors and manufacturers, including Walgreens, on September 27, 2006, February 7, 2007, and December 27, 2007 explaining

---

[1] https://www.drugabuse.gov/drug-topics/opioids/opioid-overdose-crisis

to distributor registrants their obligations to maintain effective controls against diversion and report suspicious orders as part of their duties established by the Controlled Substances Act. Consistent with the guidance of these letters, a distributor has a further obligation to devise and implement an effective system to identify suspicious orders and an obligation to report suspicious orders to the DEA as they are discovered. A distributor has an obligation under the statutory and regulatory scheme to determine the legitimacy of any order it identifies as suspicious prior to filling that order.

4.     Walgreens has already failed in this charge once before. In 2011, the Company entered a settlement with the DEA in which it would pay a record-setting $80 million fine and agree to implement critical controls for its role in negligently allowing controlled substances, including oxycodone and other prescription painkillers, to be diverted into the black market (the "2013 DEA Settlement").

5.     Eight years later, in January 2019, Walgreens' shareholders voted to force the Company to prepare a report to explain what steps the Company's Board of Directors ("Board") was taking to monitor and manage the opioid crisis. Over the opposition of the Board outlined in the Company's December 16, 2018 Proxy Statement (the "2018 Proxy"), the resolution approved by the shareholders required the Company to explain what "governance measures Walgreens has implemented since 2012 to more effectively monitor and manage financial and reputational risks related to the opioid crisis in the U.S."

6.     The result was the June 2019 Board Report on Oversight of Risk Related to Opioids (the "2019 Oversight Report") detailed in the Company's December 10, 2019 Proxy Statement (the "2019 Proxy"). In the 2019 Oversight Report the Board stated that it:

"…cares deeply about the devastating impact of the opioid epidemic on our communities. The core values of the Company are trust, care, innovation, partnership

3

and dedication. The Company and the Board work to ensure that the principles of honesty and integrity, which underpin trust, characterize every aspect of our business activity, and we are committed to transparency and engagement with all stakeholders, including our investors."

7.    The 2019 Oversight Report touted the implementation of the Company's "Good Faith Dispensing" ("GFD") policy which allegedly empowered Walgreens pharmacists to refuse to fill prescriptions if, in their professional judgment, a prescription for a controlled substance could not be properly verified.

8.    What the 2019 Oversight Report failed to acknowledge, was that not only was Walgreens doing *nothing* during the previous eight years to ensure that the GFD policy was actually being implemented, but it was also *actively* sabotaging efforts to provide pharmacists with the necessary autonomy to properly perform their legal duties. Throughout communities around America into which Walgreens pharmacies were dumping huge quantities of opioids, the Board has insisted its pharmacists regularly dispense these drugs *without* doing necessary (and required) due diligence. Moreover, as detailed by numerous pharmacists throughout the U.S., Walgreens' "support" of its pharmacists' "right to refuse to fill controlled substances prescriptions" is often belied by its management, who have insisted pharmacists fill these suspect prescriptions or be fired.

9.    Plaintiff's Counsel's investigation demonstrates that the internal control mechanisms implemented as part of the 2013 DEA Settlement between 2013 and 2019 (the "Relevant Period") may exist on paper, but are ignored in practice.

10.    These failures are a direct result of the Company's entrenched leadership whose actions suggest that the payment of regulatory fines is merely the cost of doing business – more than half of the current directors of Walgreens were directors at the time of the 2011 DEA Settlement.

11. The true cost to Walgreens of the Board's deliberate inaction is just now coming to the fore. Though the Company has settled actions brought by various states within the past ten years, current litigation ongoing in a variety of states has demonstrated just how blatant the misconduct from the Board has been. On May 22, 2022, the Attorney General of Florida announced Walgreen's would pay the state ***$683 million*** to end litigation which alleged that the Company contributed to Florida's opioid epidemic by improperly dispensing large amounts of opioids – which resulted in the deaths of thousands of Floridians and caused thousands more to suffer from addiction (the "Florida Action").[2] State Attorney General Ashley Moody stated in a press conference, "We now go into battle armed and ready to fight back hard against this manmade crisis… The funds will undoubtedly save the lives of Floridians."

12. Then, on August 10, 2022, the Honorable Charles R. Breyer of the U.S. District Court for the Northern District of California found Walgreen's liable in an action brought by the San Francisco City Attorney, concluding that "Walgreens substantially contributed to the public nuisance in San Francisco" (the "California Action").[3] A subsequent trial will be held to determine the extent of damages Walgreens will pay.

13. One week later, on August 17, 2022, Walgreens was again found liable when Judge Dan Polster of the U.S. District Court for the Northern District of Ohio ordered that Walgreens and other pharmacies to pay $650 million over 15 years to two Ohio counties after a jury found them liable for contributing to the opioid epidemic.

---

[2] The Florida Action is captioned *State of Florida, Office of the Attorney General, Department of Legal Affairs v. Purdue Pharma, L.P., et al.* (Case No. 2018-CA-001438) (Fla. Cir. Ct. Pasco County).

[3] City and County of San Francisco et al., v. *Purdue Pharma, L.P., et al.* (Case No. 18-cv-07591-CRB) (N.D. CA).

14. Finally, in a November 2, 2022 press release, the Individual Defendants caused the Company to announce Walgreen's participation in a landmark settlement wherein "the company expects to settle all opioid claims against it by participating states, subdivisions and tribes, ***for up to approximately $4.95 billion in remediation payments*** to be paid out over 15 years." (emphasis added).

15. As a result of Defendants' breaches of fiduciary duty, the Company has been harmed. Plaintiff has not made a pre-suit demand on the Board as such an effort would have been a futile act.

## II. JURISDICTION AND VENUE

16. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this complaint states a federal question: violations of Section 14(a) of the Securities Exchange Act of 1934. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

17. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because the Company is incorporated in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## III. PARTIES

18. Plaintiff is a shareholder of Walgreens and has continuously held Walgreens common stock since December 2007.

19. Nominal Defendant Walgreens is a Delaware corporation headquartered in Deerfield, Illinois. Walgreen's common stock trades on the Nasdaq Stock Market under the symbol "WBA."

20.     Defendant Stefano Pessina ("Pessina") has served as a director of the Company since 2012.  Pessina formerly served as Walgreens' Chief Executive Officer and is currently the Executive Chairman of the Board.

21.     Defendant Jose E. Almeida ("Almeida") served as a director of the Company from 2017 to 2022.

22.     Defendant Janice M. Babiak ("Babiak") has served as a director of the Company since 2012.  Babiak currently serves as a member of the Board's Audit Committee.

23.     Defendant David J. Brailer ("Brailer") served as a director of the Company from 2010 through 2022.

24.     Defendant William C. Foote ("Foote") served as a director of the Company from 1997-2022.

25.     Defendant Ginger L. Graham ("Graham") has served as a director of the Company since 2010.  Graham currently serves as a member of the Board's Audit Committee.

26.     Defendant John A. Lederer ("Lederer") has served as a director of the Company since 2015.

27.     Defendant Dominic Murphy ("Murphy") has served as a director of the Company since 2012.

28.     Defendant Leonard D. Schaeffer ("Schaeffer") served as a director of the Company from 2015 until his resignation in September 2019.

29.     Defendant Nancy M. Schlichting ("Schlichting") has served as a director of the Company since 2006.  Schlichting is a member of the Board's Audit Committee.

30.     Defendant James A. Skinner ("Skinner") served as a director of the Company from 2005 until 2021 during which time he served as the Executive Chairman of the Board.

31.     Collectively, Defendants Pessina, Almeida, Babiak, Brailer, Foote, Graham, Lederer, Murphy, Schlichting and Skinner are referred to herein as the "Individual Defendants."

32.     Collectively, Defendants Pessina, Almeida, Babiak, Brailer, Foote, Graham, Lederer, Murphy, and Schlichting are referred to herein as the "Director Defendants."

33.     Collectively, Brailer, Babiak, Graham and Schlichting are referred to herein as the "Audit Committee Defendants."

## III.   INDIVIDUAL DEFENDANTS' DUTIES

34.     By reason of their positions as officers, directors, and/or fiduciaries of Walgreens and because of their ability to control the business and corporate affairs of Walgreens, the Individual Defendants owed Walgreens and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Walgreens in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Walgreens and its shareholders to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Walgreens and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

35.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Walgreens, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Walgreens, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

36.     To discharge their duties, the officers and directors of Walgreens were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Walgreens were required to, among other things:

     A.     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

     B.     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

     C.     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

37.     The 2019 Oversight Report details the role the Board is expected to play in monitoring regulatory compliance.  The 2019 Oversight Report explicitly acknowledges the role the Board plays in mitigating risks about compliance and risks related to prescription opioids:

> "As set forth in the Company's Corporate Governance Guidelines, the Board has responsibility for overseeing risk management policies and processes designed to promote ethical conduct and legal compliance and the Company's compliance with applicable laws and regulations. As a whole and through its committees, the Board exercises oversight over the elements and dimensions of major risks that we face, including risks related to prescription opioids."

38.     The 2019 Oversight Report also emphasizes the role of the Audit Committee in ensuring compliance in matters related to prescription opioids:

> *Audit Committee*
> The Audit Committee, which consists solely of independent directors, has explicit oversight responsibility for enterprise risk assessment and risk management pursuant to its charter. It also has explicit oversight of legal and compliance matters relevant to the Company, including legal and compliance matters related to prescription opioids.

*** 

The Audit Committee receives and reviews quarterly reports from the Company's General Auditor (who has a direct reporting line to the Audit Committee) and Global Chief Compliance and Ethics Officer (who has a dotted reporting line to the Audit Committee) and also receives and reviews regular reports on risk management and the Company's ERM program and patient safety. It has executive sessions with the Company's General Auditor and Global Chief Compliance and Ethics Officer at each regular meeting. The Audit Committee and/or the Board receives and reviews a legal report, including on matters relating to prescription opioids, as applicable, from the Company's General Counsel and the General Counsel of the Company's Retail Pharmacy USA division on a regular basis. The information facilitates a robust dialogue between senior leaders and the Audit Committee with respect to key areas of Audit Committee oversight.

39.     The Board's Nominating and Governance Committee has a responsibility through its oversight of the Company's Corporate Social Responsibility function. Per the 2019 Oversight Report:

> The Nominating and Governance Committee, which consists solely of independent directors, regularly reviews risks related to our governance structures and processes and Corporate Social Responsibility ("CSR") function, which includes the ways in which we are working to address the opioid epidemic in the United States. Pursuant to its charter, the Nominating and Governance Committee has oversight responsibility for CSR matters and receives and reviews reports on these matters at least annually. It also has oversight responsibility for the Company's Code of Conduct and Business Ethics (the "Code of Conduct") which, among other things, states that employees are expected to comply with all Company policies, as well as the laws and regulations in the locations where we do business.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     The Company's Pharmacy Segment

40.     According to its public filings, Walgreens is the largest retail pharmacy, health and daily living destination across the United States and Europe. Walgreens and the companies in which it has equity investments together have a presence in more than 25 countries and employ more than 450,000 people. The Company is a global leader in retail and wholesale pharmacy and,

together with the companies in which it has equity investments, has over 21,000 stores in 11 countries as well as one of the largest global pharmaceutical wholesaler and distribution networks, with over 425 distribution centers delivering to more than 250,000 pharmacies, doctors, health centers and hospitals each year in more than 20 countries.

41.     The Company's operations are organized into three divisions: Retail Pharmacy USA, Retail Pharmacy International, and Pharmaceutical Wholesale.

42.     The Retail Pharmacy USA division has pharmacy-led health and beauty retail offerings in 50 states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands. The Company operated 9,021 retail stores in the division as of August 31, 2020. The principal retail pharmacy brands in the division are Walgreens and Duane Reade. As of August 31, 2021, approximately 78% of the population of the United States lived within five miles of a Walgreens and Duane Reade retail pharmacy.

43.     According to the Company's Annual Report on Form 10-K filed with the SEC on October 14, 2021, the Company filled 827.5 million prescriptions (including immunizations) in fiscal year 2021. The Company fills prescriptions under Medicare, Medicaid and other publicly financed or sponsored health benefit and prescription drug plans and programs, including the federal 340B drug pricing program. Sales where reimbursement is received from managed care organizations, governmental agencies, PBM companies and private insurance were approximately 97% of the division's fiscal 2021 Pharmacy sales.

**B.      The Company's Regulatory Requirements**

44.     The CSA imposes restrictions on the distribution of controlled substances—substances that pose a risk of addiction and abuse. The CSA authorizes the DEA to establish a registration program for manufacturers, distributors, and dispensers of controlled substances designed to prevent the diversion of legally produced controlled substances into the illicit market. Any

11

entity that seeks to become involved in producing or distributing controlled substances must first register with the DEA.

45. Under the DEA's regulations, registered pharmacies must "provide effective controls and procedures to guard against theft and diversion of controlled substances." 21 C.F.R. § 1301.71(a). And while "[t]he responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner," a "corresponding responsibility rests with the pharmacist who fills the prescription." 21 C.F.R. § 1301.04(a). Pharmacies therefore are required to ensure that prescriptions for controlled substances are "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." *Id.*

46. DEA registrants authorized to distribute or dispense any controlled substance are prohibited from distributing, dispensing, or manufacturing controlled substances that are not authorized by a registrant's registration. 21 U.S.C. § 842(a)(2). Registrants must maintain accurate records and furnish them when required to do so by law enforcement officials. 21 U.S.C. § 842(a)(5). Registrants must also maintain a degree of transparency by allowing law enforcement officials access to their premises for inspections authorized by the CSA. 21 U.S.C. § 842(a)(6). Failure to adhere to the registration requirements of the CSA may subject a registrant to civil fines, imprisonment, or both. 21 U.S.C. § 842(c).

47. The CSA also proscribes certain acts related to the manufacture and distribution of controlled substances and listed chemicals. Registrants who knowingly or intentionally (1) distribute Schedule I and II substances without a valid order form, 21 U.S.C. § 843(a)(1); (2) use an invalid registration number during the course of handling or acquiring controlled substances, 21 U.S.C. § 843(a)(2); (3) furnish false or fraudulent material information in a record or report required by the CSA, 21 U.S.C. § 843(a)(4)(A); or (4) present false or fraudulent identification when

receiving a listed chemical, 21 U.S.C. § 843(a)(4)(B); are subject to criminal fines, imprisonment, or both. *See* 21 U.S.C. § 843(d) (requiring prison sentences of between four and eight years for DEA registrants that violate 21 U.S.C. § 843). Additionally, registrants who violate the aforementioned provisions may be subject to injunctive or declarative actions filed by the Attorney General in federal district court. See 21 U.S.C. § 843(f).

48. Finally, the CSA specifies several offenses regarding listed chemicals, including C-II chemicals such as oxycodone. For example, criminal fines and/or imprisonment may be imposed upon any person who knowingly or intentionally (1) possesses a listed chemical with the intent to manufacture a controlled substance without proper registration; (2) possesses or distributes a listed chemical with knowledge or a reasonable belief that the listed chemical will be used to manufacture a controlled substance; or (3) evades the CSA's recordkeeping and reporting requirements by receiving or distributing listed chemicals in small units. See 21 U.S.C. §§ 841(c)(1)-(3). Also, any person who knowingly possesses or distributes listed chemicals in violation of the CSA, or knowingly violates the CSA's recordkeeping requirements, is subject to criminal fines, imprisonment, or both. See 21 U.S.C. §§ 841(f)(1)-(2). Furthermore, in addition to the other applicable penalties, violators of the aforementioned provisions may also be enjoined for up to ten years from handling listed chemicals. 21 U.S.C. § 841(e).

49. Ultimately, there are three rules' pharmacies must follow under the CSA when dispensing controlled substances. For each controlled-substance prescription, a pharmacist must (1) determine that the prescription was issued by a medical practitioner adhering to the usual course of his or her professional practice, (2) determine that the prescription is for a legitimate medical purpose, and (3) in filling the prescription, adhere to the usual course of his or her own professional

pharmacy practice. Walgreens was required to adhere to these three requirements in its role as a pharmacy dispensing controlled substances.

### C.     The Company's Regulatory Failures (2005-2011)

50.     On August 8, 2005, Walgreens reached a civil settlement with the Department of Justice ("DOJ") in which the Company accepted responsibility for supplying methamphetamine cooks with large quantities of pseudoephedrine products in northeast Texas. As part of the settlement, Walgreens paid $1.3 million and further agreed to revise its compliance policies; implement computerized sales monitoring system designed to detect and prevent sales of large quantities of pseudoephedrine products; appoint a compliance officer to monitor compliance within the Company; pay for an independent monitor selected by the U.S. Attorney to conduct compliance checks; and implement a specialized training program for employees.

51.     In 2008, Walgreens entered into a Corporate Integrity Agreement ("2008 CIA") with the Office of Inspector General of the U.S. Department of Health and Human Services that required Walgreens to enhance and enforce its policies and reporting procedures involving "[t]he proper and accurate documentation of medical and prescription records" and "[t]he proper and accurate dispensing of prescription drugs, including federal and state law requirements relating to prior authorization." The 2008 CIA also required that Walgreens design procedures to alert the Board of any drug dispensing issues and lack of compliance with state and federal laws concerning the dispensing of prescription drugs. To the extent the Policies and Procedures did not have these features, the 2008 CIA required them to be added and implemented by January 2009.

52.     Walgreens management, including members of the Board, were required to receive notice of these updated policy changes as well as regular updates on compliance with the 2008 CIA during the entirety of the five-year term of the 2008 CIA.

53.     In September 2009, Walgreens tripled the amount of oxycodone that its pharmacists were authorized to sell to customers in a single visit. Specifically, Walgreens' "90-day at Retail" program allowed Walgreens customers- who formerly could only purchase a 30-day supply of oxycodone and other C-II drugs at Walgreens' retail pharmacies- to purchase a three-month supply of drugs in a single visit to a retail store. According to a September 29, 2009, article in the *Chain Drug Review* "Walgreens has kicked off a program to deliver 90-day prescriptions for maintenance and chronic care medications through its retail pharmacies worksite centers." According to Walgreens' website, "Filing 90-day prescriptions offers customers a convenient and hassle-free way to get a three-month supply. Through the 'I Want My 90-Day At Retail' program, Walgreens customers can receive their 90-day prescription either at their neighborhood pharmacy or through mail." Walgreens saw an immediate and significant increase in the volume of prescriptions for oxycodone brought in by its newfound customers, many of whom resided hundreds of miles from Florida.

54.     On December 28, 2010, the Colorado State Board of Pharmacy (the "Colorado Board") and Walgreens pharmacy #10118 entered into a Stipulation and Final Agency Order, following a "controlled substance and prescription drug audit" conducted by the Colorado Board between November 16, 2009, and January 31, 2010. As a result of the Colorado Board's finding and the stipulation, Walgreens #10118 was placed on three years' probation and required to submit quarterly affidavits of compliance with applicable rules and regulations.

55.     In August 2011, Walgreens also agreed to pay $500,000 as part of a settlement of claims brought by the DEA pertaining to prescription drug abuse at one of the Company's Arizona pharmacies (the "2011 Arizona Settlement Agreement"). This settlement resolved issues related to dispensing controlled substances prescribed by a certain doctor and the records involving those

15

prescriptions. In the 2011 Arizona Settlement Agreement, the Company represented, among other things, that it provided training on the controlled substance record keeping and reporting requirements of the CSA and "will otherwise maintain good-faith measures to detect and prevent diversion."

56.     On September 12, 2012, the California Board of Pharmacy, Department of Consumer Affairs brought an Accusation against Walgreens 06683, located in Visalia, California, and a pharmacist at Walgreens 06683, for inadequate pharmacy security and failure to report the loss of approximately 23,277 tablets of hydrocodone-containing medications and approximately 2,767 tablets of oxycodone. Even though Walgreens had been on notice of these thefts, its district manager had told the pharmacist-in-charge to stay out of things and to "say nothing." On November 6, 2013, Walgreens entered into a Stipulated Settlement And Disciplinary Order with the California Board of Pharmacy admitting to the allegations.

### D.     The 2013 DEA Settlement

57.     In 2008 and 2009, there was a significant rise in the number of pain-management clinics registered in Florida. According to the DEA, many of these clinics were run by unscrupulous doctors who prescribed and dispensed large quantities of medications to drug abusers and organized criminals without any legitimate medical basis. According to the DEA, during the first sixth months of 2010, Florida physicians dispensed more oxycodone than all other states combined.

58.     Florida law requires wholesale distributors of controlled substances such as Walgreens to conduct due diligence and develop a program to identify suspicious orders and prevent suspicious transactions. In particular, a wholesale distributor must assess the reasonableness of orders in excess of 5,000-unit doses of any one controlled substance in any one month. A phar-

16

macy that violates Florida's controlled distribution laws may have its permit or certification revoked. Pharmacies who violate Florida law are also subject to cease-and-desist orders from the Florida Department of Health as well as a $5,000 fine per violation.

59.     In response to the opioid crisis and epidemic, federal, state, and local law enforcement began tracking down and attempting to shut down these "pill-mills" and the diversion of prescription drugs on the black market. In 2010, Florida enacted legislation to curb the "diversion" of prescription drugs such as oxycodone for recreational use. As a result of this legislation, the pain clinics established in Florida were not authorized to dispense C-II drugs. To fill their prescriptions, drug users were turned away from "pill-mills" and turned towards pharmacies like Walgreens. Walgreens stood as a primary option in Florida, home to 850 Walgreens' pharmacies.

60.     Walgreens capitalization on the "pill mill's" business led to explosive growth in oxycodone sales. In 2010, a mere three Walgreens retail pharmacies were featured on the top 100 purchasers of oxycodone in Florida. One year later, in 2011, thirty-eight Walgreens pharmacies were among the top 100 purchasers of oxycodone in Florida. By 2012, Walgreens pharmacies held forty-four spots in top 100 purchasers of oxycodone in Florida. All these retail pharmacies were supplied by Walgreens' Jupiter, Florida distribution center. This center provides oxycodone and other prescription drugs to Walgreens pharmacies in Florida and surrounding states.

61.     By late 2010 through mid-2011, Walgreens' Florida locations accounted for sixteen of the Company's twenty-five top retail oxycodone purchasers, including the top six purchasers. In 2011, at least forty-three Walgreens pharmacies in Florida purchased in excess 500,000 dosage units of oxycodone. The top six Walgreens' stores each averaged more than 1.6 million dosages of the strongest oxycodone dosage (30mg) in 2011. In comparison, the average U.S. retail pharmacy purchased only 73,000 dosage units of *all formulations* of oxycodone (15 mg and 30 mg)

during that same time period. Walgreens' expanding sales raised such red flags that it caused the DEA to send its Diversion Investigators to investigate.

62.     Notice was provided within the Company; in January 2011, the Company's Jupiter CII Function Manager, charged with overall responsibility for C-II drug operations, expressed concern about the enormous amount of volume of 30 mg oxycodone being order by three Walgreens stores, 7298, 3836, and 5018. The CII Function Manager concluded in an email to the "Manager, Rx Inventory Drug Stores" at Walgreens' Corporate Headquarters in Deerfield, Illinois (Barbara Martin) and Distribution Center Manager Rob Varno, that she felt needed to "justify the large quantity." The email went on to question the 3,271 bottles of 100 count of 30 mg of oxycodone that were prescribed out of store 3836 in Florida in a one-month period.

63.     In 2012, the DEA conducted a six-month investigation into the practices of the Jupiter Center and Walgreens' retail pharmacies in Florida. On September 13, 2012, the DEA concluded that continued distribution of controlled substances by the Jupiter Center posed an "imminent danger to the public health and safety," and issued an Immediate Suspension Order ("ISO") and Order to Show Cause ("OTSC") as to why its DEA registration should not be revoked. Backed by dozens of witnesses and hundreds of exhibits, the DEA alleged that Walgreens had committed an "unprecedented number of record-keeping and dispensing violations" in violation of the CSA. The DEA found that Walgreens' pharmacists, and its senior management, had exhibited a "staggering disregard" for the Company's obligations under the CSA. Between November 26, 2012, and February 9, 2013, the DEA ordered additional OTSCs against Walgreens' top-six oxycodone-selling pharmacies in Florida.

64.     In the largest fine ever levied against a pharmacy, Walgreens entered a settlement with the DEA executed in April 2011 and announced on June 11, 2013. Under the terms of the

2013 DEA Settlement, Walgreens was penalized $80 million for its serious and flagrant violations of its duties to prevent diversion and abuse. As part of its agreement to resolve these violations, Walgreens entered into a Memorandum of Agreement ("MOA") with the DEA to resolve outstanding allegations involving its Jupiter Walgreens distribution center and pending actions concerning its retail pharmacies located in Florida, New York, Colorado and Michigan. Walgreens agreed to pay the $80 million in civil penalties to resolve claims that Walgreens negligently allowed controlled substances, including oxycodone and other prescription painkillers, to be diverted into the black market.

65.    Walgreens' Florida operations at issue in this settlement highlight its egregious conduct regarding diversion and abuse of prescription opioids. Walgreens' Florida pharmacies each allegedly ordered more than one million dosage units of oxycodone in 2011—more than ten times the average amount. According to public news reports at the time, in Pasco County, Florida "a Walgreens drug distribution center sold 2.2 million tablets to a single Walgreens' pharmacy in tiny Hudson, a roughly six-month supply for each of its 12,000 residents."

66.    These pharmacies increased their orders over time, in some cases as much as 600% in the space of just two years, including, for example, supplying a town of 3,000 with 285,800 orders of oxycodone in a one-month period. Yet Walgreens' corporate officers turned a blind eye to these abuses. In fact, corporate attorneys at Walgreens suggested internally, in reviewing the legitimacy of prescriptions coming from pain clinics, that "if these are legitimate indicators of inappropriate prescriptions perhaps, we should consider not documenting our own potential non-compliance," underscoring Walgreens' attitude that profit outweighed compliance with its legal obligations or the health of communities.

67. After the DEA had initiated its Florida regulatory investigation in 2012, Walgreens made presentations to the DEA about its "Controlled Substance Anti-Diversion and Compliance Program" in an effort to "cooperate and avoid litigation," and represented to the DEA that it was making "new changes" to "enhance" its program.[4] However, rather than enhancing its compliance program, internally Walgreens was far more candid, admitting that it only enhanced its program "in an effort to convince DEA that the proposed penalty is excessive…."[5]

68. On August 19, 2011, a DEA Diversion Investigator, Diversion Group Supervisor, and Diversion Program Manager, met with Walgreens personnel at the DEA Miami Field Division offices in Weston, Florida to apprise them of relevant DEA-generated information about Walgreens' sale of oxycodone in Florida. Because of the importance of this meeting and its regulatory and high-level attendees, it is reasonable to infer that the Board knew or should have known that this meeting was taking or took place and of the substance of the discussion.

69. According to publicly available DEA documentation, following this meeting and as part of its "Focus on Compliance," Walgreens allegedly sought to appear to be taking action and developing "Oxycodone Action Plans" within certain districts of Florida to reduce the volume of oxycodone dispensed in Walgreens pharmacies. For example, one store in Hudson, Florida, the plan devised by District Pharmacy and Loss Prevention supervisors in a memo dated August 23, 2011, included "contacting the Jupiter warehouse and designating order limits for Oxycodone." The plan, effective immediately, was supposed to "limit" the Hudson store to orders of no more than 100 bottles of 100 count 30 mg oxycodone. Notwithstanding the memo and the "plan" to limit

---

[4] *See In Re: National Prescription Opiate Litigation*, (Case No. 17-md-2804), Plaintiffs' Memorandum in Opposition to Defendants Walgreens' Motion for Summary Judgment, Exhibit 18 (Dkt. 2205-18), at WAGMDL00659802.

[5] *Id.* at Exhibit 27 (Dkt. 2205-27), at WAGMDL00659270.

that store's purchase to no more than 100 bottles, the DEA found that the Jupiter Center shipped the following orders to that store:

| Date | Bottles | Dosage Units |
|------|---------|--------------|
| 9/26/2011 | 331 | 33,100 |
| 10/10/2011 | 371 | 37,100 |
| 11/29/2011 | 200 | 20,000 |
| 12/6/2011 | 113 | 11,300 |
| 12/13/2011 | 150 | 15,000 |

70.    Using this data as an example, the DEA concluded that Walgreens' "inability to enforce a very simple, modest limitation on this one pharmacy is further evidence of its failure to maintain effective controls against diversion, even in the rare instance when it tried to do so."

71.    The DEA's investigation was initially centered on the Company's distribution center in Jupiter, Florida, which was responsible for significant opioid diversion and abuse in Florida. The DEA found that Walgreens' corporate headquarters had pushed to increase the number of oxycodone sales to its Florida pharmacies and provided bonuses for pharmacy employees based on number of prescriptions filled at the pharmacy to increase oxycodone sales. In July 2010, Walgreens had ranked all of its Florida pharmacies by number of oxycodone prescriptions dispensed in June of that year and found that the highest-ranking store in oxycodone sales sold almost 18 oxycodone prescriptions per day. All these prescriptions were filled by the Jupiter Center.

72.    The underlying conduct was not just limited to Florida. The 2013 DEA Settlement also resolved similar open civil investigations in the District of Colorado, Eastern District of Mich-

21

igan, and Eastern District of New York, as well as civil investigations by DEA field offices nationwide, pursuant to the CSA. Public information regarding misconduct investigated in the Eastern District of New York shows that Walgreens was alleged to have violated the CSA by filling numerous prescriptions that Walgreens employees knew, or should have known, were not issued for a legitimate medical purpose, including those prescribed by a nurse practitioner, Eva MacDowall. According to the Department of Justice, over a two-year period from July 2010 until July 2012, MacDowall had written 94 different, illegitimate prescriptions—primarily for two highly addictive painkillers, oxycodone and hydrocodone—which were filled at a Walgreens pharmacy in Selden, New York and two Walgreens pharmacies in Medford, New York.

73.     Moreover, Walgreens also admitted wrongdoing at its pharmacies located in Colorado. The majority of these violations were found at Walgreens pharmacies located in Canon City and Pueblo, Colorado. The investigation uncovered instances of Walgreens pharmacies filling fraudulent prescriptions; filling prescriptions written by a physician with an expired DEA registration; filling prescriptions lacking an address and/or DEA registration number, in violation of DEA regulations; and dispensing controlled substances to customers without a prescription. The investigation also uncovered hundreds of examples of inaccurate or incomplete recordkeeping for controlled substances at Walgreens pharmacies located throughout Colorado.

74.     As part of the MOA, Walgreens admitted that its "suspicious order reporting for distribution to certain pharmacies did not meet the standards identified by DEA in three letters from DEA's Deputy Assistant Administrator, Office of Diversion Control, sent to every registered

manufacturer and distributor, including Walgreens, on September 27, 2006, February 7, 2007, and December 27, 2007."[6]

75.     It was clear that the "staggering" regulatory issues and red flags which had led to the MOA extended throughout Walgreens' nationwide operations. For example, in 2012, when drug maker analyzed Walgreens' controlled substances sales by state, it observed: "Although we thought FL/GA stores might be more 'questionable' than other states, the data has actually shows that this is not the case.... On a national level, 21% of Rx's and 24% of pill count are Controlled Substances vs. Non-Controls.... FL/GA stores are not necessarily 'abnormal'.... There are other states that have somewhat comparable questionable store percentages ...."[7]

76.     The DEA's findings thus were not a surprise to Walgreens, which knew that the failure to institute effective controls against diversion and abuse going on at its retail pharmacies was universal. The Individual Defendants had complete visibility into all opioid prescription data related to its pharmacies, and internally touted its ability to conduct sophisticated "[d]ata mining... across [its] retail pharmacies to determine the maximum amount that a pharmacy should be allowed to receive...," though it failed to appropriately incorporate this data into its program to prevent the excessive flood of opioids into its pharmacies throughout the U.S.[8]

77.     According to the terms of the MOA that Walgreens entered into with DOJ and the DEA with regard to its dispensing of controlled substances, Walgreens agreed to maintain a compliance program to "detect and prevent diversion of controlled substances as required under the

---

[6] *See In Re: National Prescription Opiate Litigation*, (Case No. 17-md-2804), Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motions for Summary Judgment on Proof of Causation, Exhibit 117 (Dkt. 2426-2), WAGMDL00490963.

[7] *Id.* at Exhibit 39 (Dkt. 2205-39), at WAGMDL00774715.

[8] *Id.* at Exhibit 42 (Dkt. 2205-42), WAGMDL00757776.

CSA and applicable DEA regulations" which would "identify the common signs associated with diversion of controlled substances:"

> Walgreens agrees to maintain a compliance program in an effort to detect and prevent diversion of controlled substances as required under the CSA and applicable DEA regulations, as set forth in the attached Addendum. This program shall include procedures to identify the common signs associated with the diversion of controlled substances.

78.     In addition, its compliance program would include "routine and periodic training of all Walgreens employees responsible for dispensing controlled substances on the elements of the compliance program and their responsibilities under the CSA and applicable DEA regulations:"

> The program shall also include the *routine and periodic training of all Walgreens pharmacy employees responsible for dispensing controlled substances on the elements of the compliance program and their responsibilities under the CSA and applicable DEA regulations.* This compliance program shall apply to all Walgreens Pharmacies and CPO Facilities.

79.     Likewise, the MOA required that Walgreens shall "implement and maintain policies and procedures to ensure that prescriptions for controlled substances are only dispensed to authorized ultimate users pursuant to federal and state law and regulations."

80.     Walgreens also agreed that it would "direct and train its pharmacists that their corresponding responsibility under federal law requires them not to fill a prescription that such pharmacist knows or has reason to know was issued for other than a legitimate medical purpose or by a practitioner acting outside the usual course of professional practice."

81.     In addition to these obligations, an attached "Addendum: Prospective Compliance" to the MOA required that Walgreens would maintain a "Department of Pharmaceutical Integrity" to coordinate compliance efforts related to controlled substances. The Addendum also included Walgreens' promise to train its pharmacy personnel on the "red flags" of diversion and annually

on its "Good Faith Dispensing Policy" related to "changing diversion threats of which Walgreens is aware":

> Walgreens will continue to enhance its Good Faith Dispensing Policy and training materials *to identify "red flags" of potential diversion* for pharmacists to consider in making professional judgments regarding dispensing of controlled substances. Walgreens will train its pharmacy personnel *at least annually on Good Faith Dispensing and will update the Good Faith Dispensing Policy and training materials to respond to changing diversion threats of which Walgreens is aware*. DEA will share information with Walgreens periodically regarding circumstances that may present "red flags" of potential diversion. Walgreens' training program will also instruct pharmacists and supervisory personnel to contact the Department of Pharmaceutical Integrity, as appropriate, to address specific problematic issues arising with particular patients or physicians, so that the Department of Pharmaceutical Integrity can assess and respond to such issues. Pharmacist training will also cover instruction on how to assist DEA in obtaining records as required by this Agreement or any regulations.

82.    Finally, the Addendum required that, beginning in 2014, Walgreens would exclude accounting for controlled substances dispensed at its pharmacies from bonus computations for pharmacists and pharmacy technicians at pharmacies.

83.    As a result of the DEA investigation, Walgreens formed what it called the Pharmaceutical Integrity ("RX Integrity") group in 2012 purportedly to direct Walgreens' compliance efforts. When Walgreens created the RX Integrity group, it stated that the purpose of the department was to "play a greater role in the Opioid Narcotic Epidemic … [by] ensuring safety, compliance, and security of the ordering and dispensing of controlled substances."[9] Yet internally, the group viewed its real role as protecting the Distribution Centers and pharmacies from losing their DEA licenses.[10]

---

[9] *Id*. at Exhibit 48 (Dkt. 2205-48), WAGMDL00303029.

[10] *Id*. at Exhibit 29 (Dkt. 2205-29), WAGMDL00101723.; *See also* Exhibit 30 (Dkt. 2205-30), WAGMDL00060486.

84. In fact, Walgreens' compliance efforts were largely for show. Not only did it have no intention of following through on its promised compliance initiatives, Walgreens never intended that RX Integrity would do more than superficially limit opioid dispensing, nor would it provide the RX Integrity unit with the necessary resources to perform adequate due diligence for Walgreens' 9,285 pharmacies. Though it was charged with monitoring both its distribution centers and its massive network of 9,285 pharmacies, during much of the Relevant Period, Walgreens' RX Integrity department consisted of fewer than 5 people, and at its height, it only had eleven members.[11]

85. In response to DEA scrutiny, instead of addressing the diversion problem, Walgreens revised its suspicious order policy. According to publicly available DEA documentation, in April 2012, Walgreens revised its "order" policy, but made this policy retroactive to January 1, 2012. The policy states, in pertinent part, that:

> Effective calendar year 2012, the Controlled Substance Order Monitoring and Prevention System prevents suspicious control drugs from being shipped to the stores. In the calendar year 2012, because of the program mentioned, *suspicious control drug reports are no longer generated as their shipment is prevented by the system.*

86. This policy, however, was fundamentally flawed because it ignores the fact that reporting the requirement of 21 C.F.R § 1301.74(b) applies to *orders* not shipments. A suspicious order placed by a customer pharmacy is made no less suspicious by application of a system designed to reduce or eliminate such orders prior to shipping. Construing the regulation this way defeats the essential purpose of the suspicious requirement, which is to provide investigators in the field with information regarding potential illegal activity in an expeditious manner.

---

[11] *Id*. at Exhibit 29 (Dkt. 2205) at 7.

87.     DEA documentation shows that on June 14, 2012, a DEA Group Supervisor conducted a telephone interview with an in-house counsel Dwayne Pinon ("Pinon") for Walgreens. Pinon was at the August 19, 2011, meeting with the Diversion Program Manager of the DEA's Miami Field Division. According to the DEA, during the June 14, 2012, interview, Pinon stated that Walgreens' prior suspicious order reporting system was based on a formula for pseudoephedrine reporting in the DEA Chemical Handlers Handbook. Pinon stated that the old system automatically reported any orders for quantities above the algorithm's threshold limit. Pinon stated that the DEA had informed Walgreens that this algorithm reporting system was outdated, and that Walgreens need to establish their own system for reporting suspicious orders. Pinon informed the DEA that Walgreens had implemented a new system which they hoped to present to the DEA at some point. According to Pinon, the new system set limits on a pharmacy ordering controlled substances based on their sales history, and an order over the limit would trigger an alert to Walgreens Loss Prevention. Loss Prevention would then resolve the order. Pinon stated that any orders that Loss Prevention could not resolve would be reported to the DEA. However, he stated that initial implementation of this new version of the Suspicious Order Monitoring System had produced "thousands" of allegedly suspicious orders and was this still be adjusted to produce different results. This shows that the Company's reporting systems, imposed by the 2008 CIA and, as alleged below, and other settlement agreements, were admittedly outdated and ineffective. Because Walgreens' counsel admitted to DEA officials the Company's systems were ineffective, it is reasonable to infer that the Board knew or should have known the same regarding these existing policies and reporting systems.

88.     Given these high-level meetings with senior management and corporate counsel, in addition to the modified memos circulated from management to Walgreens pharmacies designed

to avoid creating any awareness of potential failures to comply with applicable law, it is reasonable to infer that the Board knew or should have known that the company was violating the applicable provisions of the CSA in exchange for higher prescriptions fills and profits and did nothing to remedy these issues.

### E. After Entering the MOA, Walgreens Made Sure its Pharmacies Still Had an Unlimited Supply of Opioids

89.     In 2014, Walgreens ceased self-distribution of opioids but did not exit the opioid business. When it ceased self-distribution, Walgreens entered into an agreement with AmerisourceBergen Corporation ("AmerisourceBergen") to become its exclusive controlled substance distributor. As part of this "partnership," Walgreens ultimately acquired more than 26% of AmerisourceBergen stock and is now considered a "related party" to AmerisourceBergen under SEC rules.

90.     Since joining forces with AmerisourceBergen, Walgreens and AmerisourceBergen have worked together to ensure an unimpeded, continued supply of opioids in Walgreens' 9,285 pharmacies, which also allowed it to avoid reporting to the DEA suspicious orders made by its pharmacies. For example, during the process of transitioning Walgreens' distribution to AmerisourceBergen, one AmerisourceBergen employee stated: "I'm trying to think of everything we can do to prevent having a bunch of orders reported to DEA and held."[12]

91.     Further, despite DEA guidance that "a suspicious order placed by a customer pharmacy is made no less suspicious by application of a system designed to reduce or eliminate such orders prior to shipping," AmerisourceBergen and Walgreens agreed to set up a system with the

---

[12] *In Re: National Prescription Opiate Litigation*, (Case No. 17-md-2804), Plaintiffs' Memorandum in Opposition to Defendants Walgreens' Motion for Summary Judgment, Exh. 53 (Dkt. 2205-53), ABDCMDL00280818.

"goal" to have Walgreens "police its own orders and block any order to ABC [AmerisourceBergen] that would exceed ABC's threshold thus triggering a suspicious order being sent to DEA from ABC."[13] When this system proved less than fully functional, and orders "outside the expected usage" were made by any of Walgreens' 9,285 pharmacies, AmerisourceBergen and Walgreens set up meetings to address the concern.[14]  Potential solutions to the concern were adjusting thresholds or using what they euphemistically called "soft blocking."

92.     AmerisourceBergen has also provided Walgreens with weekly statistics related to its order monitoring, which showed individual Walgreens pharmacies that exceeded the parameters of its order monitoring program.[15] Generally, however, AmerisourceBergen would not take action on Walgreens orders that exceeded its thresholds without first talking to Walgreens.[16]

93.     Accordingly, even after it stopped self-distributing in 2014, Walgreens has continued to conceal from the DEA and law enforcement officials known diversion, abuse, and inappropriate prescribing so that its supply of opioids would not be disrupted.

F.     **The Company Incentivizes and Pressures Pharmacists to Fill All Prescriptions as Quickly as Possible**

94.     Walgreens' corporate policies have encouraged the over-distribution and over-dispensing of opioid products. Through its pharmacist bonus programs, Walgreens rewarded its employees to fill as many prescriptions as possible, including controlled substance prescriptions. In the DEA's 2013 Order to Show Cause, the DEA wrote that Walgreens' "bonus program [had]

---

[13] *Id.* at Exh. 54 (Dkt. 2205-54), ABDCMDL00277369.

[14] *Id.* at Exh. 55 (Dkt. 2205-55), ABDCMDL00278991.

[15] *In Re: National Prescription Opiate Litigation*, (Case No. 17-md-2804), Plaintiffs' Memorandum in Opposition to Defendants Walgreens' Motion for Summary Judgment, Exh. 59 (Dkt. 2205-59), Elizabeth Garcia Dep. (12/14/18) at 280:23-282:1.

[16] *Id.* at 299:19-303:11.

combined with a concerted, corporate directed effort to increase oxycodone sales, served as an incentive for pharmacists and pharmacy technicians to ignore the 'red flags' of diversion and abuse presented by these prescriptions, many of which, in the proper exercise of the pharmacist's corresponding responsibility under 21 C.F.R. § 1306.04(a), should have resulted in a refusal to fill."

95.     Despite pledging to change its compensation structure, Walgreens' singular, overarching goal always has been its profitability, often at the expense of safety and compliance. To this day, Walgreens still bases bonuses and salary increases on total prescriptions sold in its 9,285 pharmacies, which includes controlled substances.[17]

96.     Walgreens retail pharmacies play a key role in ensuring Walgreens' overall profitability. According to its public filings with the SEC, as of 2021, the Company's pharmacy division accounts for 76% of Walgreens' sales while retail accounts for a mere 24%. This represents a steep rise from 2013 when Pharmacy accounted for 63% of Walgreens sales. Thus, for Walgreens to be profitable, its pharmacies need to be profitable.

97.     Historically, Walgreens has relied on increasing the number of prescriptions filled to increase and ensure its pharmacy profitability. This focus on driving prescription volume above all else is the centerpiece of Walgreens' pharmacy strategy. Two events, however, put even more pressure on Walgreens pharmacies to increase the amounts of prescriptions dispensed by its pharmacies.

98.     First, The Affordable Care Act greatly reduced the reimbursements pharmacies would get from government programs. By 2013, pharmacy reimbursements were down over 20%

---

[17] *In Re: National Prescription Opiate Litigation*, (Case No. 17-md-2804), Defendants' Notice of Filing Redacted Deposition Transcripts Cited in Summary Judgment and Daubert Response Briefs Pursuant to Order Amending Procedures Regarding Redactions and Filing Briefs Under Seal, Exh. Exh. 16 ((P. Daugherty Dep. at 430:12 – 432:11) (Dkt. 2173-16)).

99.     Second, Walgreens lost its PBM contract with Express Scripts on January 1, 2012. According to a December 2011 post on *Seeking Alpha*, "the contract accounted for $5.3 billion of sales in fiscal 2011 as Express Scripts processed 88 million prescriptions filled by Walgreens. In the recently concluded quarter the pharmacy benefit manager processed as much as 26 million prescriptions from Walgreens."

100.    Walgreens pharmacists have been directed to meet higher and higher profitability goals that make it difficult, if not impossible, to comply with applicable CSA and state pharmacy laws and regulations as well as the Company's obligations under the 2013 DEA Settlement. If Walgreens pharmacists did not meet "Key Performance Indicators," they would receive negative performance reviews. For example, Walgreens policy required pharmacies to fill prescriptions for waiting customers within 15 minutes. That meant the pharmacy had 15 minutes from the time the prescription was entered into the system until the prescription had to be complete and sold to the customer, regardless of the substance involved.

101.    The only things measured and thus rewarded by Walgreens were the sales and profitability goals. This created a culture where the number of prescriptions filled, their speed, and their corresponding reimbursements were the measures of success at Walgreens. The role of the pharmacist as a healthcare professional serving and counseling patients had been completely lost. Instead, at all times material hereto, Walgreens pharmacists have been pressured to be cogs in a prescription filling machine, rather than the last line of defense against medically unnecessary and/or inappropriate prescriptions.

102.    In short, Walgreens created a situation where if you do your job correctly you get penalized. Only if the Key Performance Indicators were met were pharmacists eligible for bonuses.

Performance incentives were based mostly on prescription volume and Walgreens continually evaluated pharmacists on how volume grew.

103.     Compounding the problem of undue pressure on pharmacists to fill each and every prescription was a restructuring of the management organization of the Walgreens' retail pharmacies. Instead of being directly supervised by another licensed pharmacist as manager, Walgreens chose to put a front-of-the-store manager overseeing the pharmacy. This meant that in-store, Walgreens pharmacists reported to the store managers who were not pharmacists. This often created conflict, with the non-pharmacist store managers pressuring pharmacists to fill prescriptions without an understanding of what made prescriptions inappropriate.

104.     On February 21, 2020, the *New York Times* published an article titled *At Walgreens, Complaints of Medication Errors Go Missing.* The article highlights how Walgreens was well aware that its "unreasonable" expectations on pharmacists had "led them to make mistakes while filling prescriptions and to ignore some safety procedures." In fact, the *Times* reviewed internal documents showing that Walgreens intentionally ignored these findings. According to the *Times*, senior leaders at Walgreens engaged a consultant to review its computer system for filling prescriptions. Instead of taking the feedback about serious issues with Walgreens' dispensing practices, senior executives intentionally ignored the problems and swept them under the rug, ensuring the issues were not fixed. For example, "Amy Bixler, the director of pharmacy and retail operations at Walgreens, told [the consultants] to delete a bullet point last month that mentioned how employees 'sometimes skirted or completely ignored' proper procedures to meet corporate metrics, according to the chat logs and the draft report."

105.     The consultant's report also noted that at Walgreens there was "a widespread perception that there is not enough time to respond to all pharmacy tasks." The consultants also found

"'multiple reports of improper behavior' that was 'largely attributed to the desire' to meet a corporate metric known as 'promise time,' which ensures that patients get prescriptions filled within a set amount of time."

### G. Walgreens Had No Rigorous Enforcement of Dispensing Protocols or Policies Requiring Its Pharmacies to Identify Inappropriate Prescriptions

106.    Walgreens' singular focus on filling all prescriptions as quickly as possible was fueled by a lack of rigorous enforcement of dispensing protocols or policies for filling prescriptions for controlled substances. Enforcement of such policies would not have only resulted in denying more inappropriate prescriptions, but also would have slowed down the speed at which prescriptions were filled. Instead, Walgreens has insisted its pharmacies operate as production lines which rewarded speed and sacrificed attention to patient care. Critically, Walgreens pharmacies have failed to apply policies or protocols about how to address inappropriate prescriptions. Walgreens has had little in the way of guidance, training, or resources for pharmacists or technicians to consult about whether a prescription was medically appropriate and should (or should not) be filled. Even to the extent that Walgreens had policies and procedures, Walgreens rarely emphasized or enforced those policies.

107.    Walgreens relied on three primary methods to identify medically inappropriate prescriptions at its pharmacies: the Target Drug Good Faith Dispensing Checklist ("TDGFD Checklist"), state Prescription Drug Monitoring Programs ("PDMPs"), and Drug Utilization Reviews ("DURs").

108.    These methods were largely ineffective in curbing the rampant dispensing of medically inappropriate prescriptions at Walgreens pharmacies. For example, despite all three methods being in place (TDGFD, DUR, and PDMP), Walgreens' dispensing exploded in Florida before being busted by the DEA in 2013. Walgreens went from having three of the top pharmacies for

oxycodone purchases in Florida to 44 of the top pharmacies for oxycodone purchases in Florida by 2012. From 2009 to 2011 individual pharmacies in Florida saw a whopping 5- fold, 16-fold, 20-fold increase in oxycodone purchasing.

109. Even after the settlement with the DEA, the three methods Walgreens had in place did little to stem the tide of inappropriate dispensing at Walgreens' pharmacies. For example, in 2018, a Chico, California Walgreens store (#13000) came under DEA scrutiny for ordering and dispensing unusually large amounts of the highly addictive opioids hydrocodone and oxycodone, according to court documents. In 2016 alone, hydrocodone shipments to the pharmacy totaled more than seven times the national average, and shipments of oxycodone exceeded the same standard by nearly fivefold. The Chico Walgreens has over the course of three years purchased around twice the amount of both drugs as the next-largest buyer in its area.

## H. Walgreens Failed to Enforce Compliance with Its Target Drug Good Faith Dispensing Checklist

110. As a result of the 2013 DEA Settlement, Walgreens promised that it would reemphasize and regularly update its GFD policy. Yet Walgreens did little other than to document what pharmacies should have already been doing. The revised policy was called the TDGFD Checklist.

111. For any instance in which an opioid prescription was refused, the TFGDP program required the pharmacist to document the decision and notify the DEA. This was not a new change. Under the terms of the 2013 DEA Settlement Agreement, Walgreens had already agreed to it would notify the DEA within two days of a refusal to fill.

112. In terms of employee accountability, Walgreens ostensibly made clear that its pharmacists would be "required" to document refusals to fill in the "patient comments" field and that "[f]ailure to comply will lead to disciplinary action up to and including termination."

113.     Walgreens also claimed that its management was to "reinforce" the TDGFD Checklist during pharmacy site visits by looking through the "refusal file" to make sure that copies had been faxed to the DEA, and that the Checklists had been completed.

114.     Moreover, no Oxycodone, Hydromorphone or Methadone prescription over 60 units (cash) and over 120 units (third party payment) was to be filled by any Walgreens pharmacist. In addition, the Checklist required a call to the prescriber as part of completing the forms.

115.     More importantly, other than cosmetic changes aimed at placating the DEA, the TDGFD Checklist did not result in any actual long-term, structural changes at Walgreens, nor has it acted as a check on inappropriate dispensing at its pharmacies.

116.     Walgreens' lack of candor about its intentions with regard to the Checklist started with the initial rollout of the updated policy after it had paid $80 million in fines to the DEA. Despite promises it had made to the DEA that it would make these changes, in fact very little actually happened. The promise in the 2013 DEA Settlement requiring that Walgreens would "direct and train its pharmacists" on their corresponding responsibilities under the CSA was only lip service, which management would soon push aside and instead insist they would be back to business as usual.

**I.     Walgreens Failed to Require Pharmacists to Check State PDMP Databases**

114.     As part of the 2013 DEA Settlement, Walgreens was required to provide pharmacists with access to state PDMP databases. Notwithstanding its ostensible TDGFD Checklist requirement that its pharmacists in every instance check state PDMP databases for every opioid prescription, upon information and belief, at no time has Walgreens ever required its pharmacists to check these databases. Walgreens' failure to require its pharmacists check the PDMP data has

led pharmacists in many of its 9,285 pharmacies simply never to check the state these databases at all.

115. In fact, Walgreens did as little as possible to encourage PDMP use. For example, until very recently, the PDMP system at Walgreens pharmacies ran on a separate computer system than pharmacists used to fill the prescription, making it very difficult for pharmacists to access this information.

116. The simple fact is that Walgreens made little effort to track or otherwise encourage (let alone actually require) the use of the PDMP databases throughout the U.S. On the contrary, the fact that checking the PDMP database was so onerous discouraged pharmacists from checking it at the expense of keeping up with metrics which required them to fill as many prescriptions as possible, and quickly. While a requirement that pharmacists check the PDMP would have greatly increased the time it took to fill prescription, it would have identified many more prescriptions that were medically inappropriate.

## J. Walgreens Failed to Utilize Its Drug Utilization Review to Identify Inappropriate Opioid Prescriptions

117. Walgreens has also failed to identify and stop the dispensing of medically inappropriate prescriptions through use of Drug Utilization Reviews ("DURs"). DURs are defined as an authorized, structured, ongoing review of healthcare provider prescribing, pharmacist dispensing, and patient use of medication. DURs involve a comprehensive review of patients' prescription and medication data before, during, and after dispensing to ensure appropriate medication decision making and positive patient outcomes.

118. This was not a new problem. Walgreens had settled two cases, one in California in 2017 and one in Wisconsin in 2019, that were due in part to a failure of Walgreens to ensure that DUR review was completed before dispensing medication. In both cases, the government alleged

that Walgreens defrauded state Medicaid programs because Walgreens did not perform DURs, a condition of payment for the Medicaid claims in California and Wisconsin.

119.    As with its other methods of allegedly curbing inappropriate dispensing, Walgreens' DUR compliance documentation differed greatly from what happened in practice. Instead of using DURs to identify and halt dispensing of medically inappropriate prescriptions, Walgreens routinely ignored the DURs in pursuit of ever-higher numbers of prescriptions dispensed.

### K.    The Individual Defendants Caused Walgreens to Turn a Blind Eye to the Opioid Crisis and Refused to Use Its Own Data to Identify Inappropriate Prescriptions

120.    Walgreens ignored concerns raised by pharmacists regarding the rampant filling of inappropriate opioid prescriptions. Walgreens failed to use its own data to identify red flags which would have assisted its pharmacists in identifying pill mill doctors who were writing large numbers of suspicious prescriptions, or to prevent the filling of prescriptions that were illegally diverted, dispensed, or otherwise contributed to the opioid crisis.

121.    In a 2013 article in the *New England Journal of Medicine*, two CVS pharmacy executives recognized that chain pharmacies are in a unique position to stop the dispensing for suspicious prescribers and outlined how data could be used. They explained that chain pharmacies "have the advantage of aggregated information on all prescriptions filled at the chain" and that "[a]nalyses of aggregated data … can also target patterns of abuse by both prescribers and patients." They thus concluded that "[g]iven the growing use of controlled substances and the resulting illness and deaths, *more innovative use of transparent data is only prudent*."  Even though it could have used its own data to identify outlier prescribers and inappropriate prescriptions, there is no evidence Walgreens used its own easily accessible data to identify suspect doctors and medically unnecessary prescriptions.

122.     Walgreens further refused to take reasonable measures to stop its 9,285 retail pharmacies from dispensing unreasonable amounts of opioids nor to block prescriptions from suspicious prescribers, even while telling the public it was complying with its duties as a dispensing pharmacy to prevent diversion and abuse. Walgreens did so in order to further its goal of selling as many drugs as possible while it ensured that the growing demand for opioids would be met by skyrocketing supply and an unimpeded flow of drugs into even the most blighted areas of the country.

123.     Walgreens knew or should have identified red flags showing that its pharmacies were (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling prescriptions of unusual size and frequency paid for in cash; (f) filling prescriptions of unusual size and frequency from the same prescribing physician; (g) filling prescriptions of unusual size and frequency from out-of-state physicians; (h) filing prescriptions for patients and doctors in combinations that were indicative of diversion and abuse; (i) filling prescriptions for prescribers who were facing (or already faced) license suspension, indictment, and/or conviction. Frequently, the volumes of opioids distributed to and dispensed by these Walgreens pharmacies were disproportionate to non-controlled drugs and other products sold by these pharmacies, and disproportionate to the sales of opioids in similarly sized pharmacy markets.

124.     Walgreens had complete access to, and full visibility of, all prescription opioid distribution data and dispensing data related to its pharmacies nationally. Walgreens had complete access, and full visibility into, data revealing the prescribers whose patients were seeking opioids

be dispensed in its pharmacies nationally, as well as these prescribers' license revocation proceedings, indictments, and/or convictions. Walgreens had complete access, and full visibility into, data revealing the pill-seeking customers who filled (or sought to fill) prescriptions for opioids at its pharmacies nationally.

125. Despite this access into information which would have assisted its pharmacies in identifying the red flags of diversion and abuse, Walgreens refused to use its own data or resources to: (a) analyze the number of opioid prescriptions filled by individual pharmacies relative to the population of the pharmacy's community; (b) analyze the increase in opioid sales relative to past years; (c) analyze the number of opioid prescriptions filled relative to other drugs; (d) analyze the increase in annual opioid sales relative to the increase in annual sales of other drugs; (e) analyze and then block pill mill prescribers; nor (e) track prescribers whose licenses were subject to suspension and/or revocation proceedings, indictment, and/or conviction.

**L.    The Individual Defendants Mislead Shareholders Regarding the Company's Compliance Efforts**

126. The effects of the growing opioid epidemic across the country, and Walgreens' role in it, may have eluded the Individual Defendants, but it did not escape the attention of shareholders.

127. In the Company's 2018 Proxy Statement, Walgreens shareholder Mercy Investment Services, Inc. submitted a shareholder proposal for consideration by all shareholders requiring the Board to "to report to shareholders by June 30, 2019 describing the corporate governance changes Walgreens has implemented since 2012 to more effectively monitor and manage financial and reputational risks related to the opioid crisis, including whether and how the Board oversees Walgreens' opioid-related programs and AmerisourceBergen's opioid-related risks, whether the crisis has been designated (or is encompassed within) a material corporate social responsibility

(CSR) issue and whether and how Walgreens has changed senior executive incentive compensation arrangements."

128.    The Board urged shareholders to vote ***against*** this proposal, and in doing so, sought to assuage concerns of shareholders and detailed the efforts already undertaken by Walgreens. The Board told shareholders to vote against this proposal in the 2018 Proxy Statement because:

**The Company already discloses the governance measures and other controls it has implemented to effectively monitor and manage significant risks associated with the Company's business.**

As discussed in this Proxy Statement under "Governance—Board Oversight of Strategy and Risk Management," the Company has implemented a strong ERM program, led by the Global Chief Compliance and Ethics Officer. The ERM program reviews on a regular basis the top current and emerging enterprise risks facing the Company, including opioid-related risks. In addition, pursuant to its charter, the Audit Committee reviews our policies and processes with respect to enterprise risk assessment and risk management and discusses with management the key risks identified in the ERM process and our risk mitigation strategies on an ongoing basis. In addition, the other standing committees of the Board review and oversee management of risks related to their respective areas of responsibility. The committees regularly report to the full Board regarding identified risks and risk management.

\*\*\*

**These actions demonstrate that the Company is committed to combatting opioid abuse and overdose-related deaths.**

As discussed above, the Company and the Board are undertaking significant efforts to prevent opioid abuse and overdose-related deaths including, among other things, our robust ERM program and the installation of safe drug disposal kiosks in our pharmacies nationwide. Furthermore, the Company has regularly updated and disclosed its policies and practices related to these efforts and plans to continue to do so going forward. In light of this**,** the Board believes that a report such as the one requested by the proposal is not necessary. Such a report would provide only incremental additional information to stockholders and would not advance the Company's strong ERM program or other risk management controls. Therefore, the Board believes that the proposal is not in the best interest of the Company's stockholders.

129.     As detailed herein, despite these representations to shareholders, the Board had not regularly reviewed or implemented the requisite procedures to address the risk faced by the Company due to its role in the opioid epidemic.

130.     The proposal would pass over the Board's objection and the 2019 Oversight Report would be published the next June and highlighted in the Company's 2019 Proxy Statement.

131.     Yet what the 2019 Oversight Report failed to acknowledge, was that not only was Walgreens doing *nothing* during the previous eight years to ensure that the GFD policy was actually being implemented, but it was also *actively* sabotaging efforts to provide pharmacists with the necessary autonomy to properly perform their legal duties.

## M.     Failure to Comply With The DEA Agreement Leads to Material Damages

132.     By 2009, the Jupiter Center had become the single largest distributor of oxycodone products in Florida. Florida has been Walgreens' most strategically important state. In recent years, more than ten percent of Walgreens pharmacies have been in Florida. In fiscal year 2010, there were 850 Florida locations (10.6%), 864 in fiscal year 2011 (10.5%), and 876 in fiscal year 2012 (10.5%). Because Florida has been Walgreens' single most important state, it is reasonable to infer that the Board was particularly aware of developments affecting Walgreens' business in Florida.

133.     In July 2010, Walgreens' corporate headquarters conducted an analysis of oxycodone dispensing for the prior month at its Florida retail pharmacies. Management produced an eleven-page spreadsheet, ranking all Florida stores by the number of oxycodone prescriptions dispensed in June 2010. The spreadsheet was sent to Walgreens' market pharmacy supervisors in Florida on July 29, 2010, with the admonition that they "look at the stores on the bottom end… We need to make sure we aren't turning legitimate scripts away. Please reinforce." A corporate

41

market director of pharmacy operations reinforced this message to Florida market pharmacy supervisors, highlighting that their "busiest store in Florida" was filling almost 18 oxycodone prescriptions a day yet, "We also have stores doing about 1 a day. Are we turning away good customers?"

134.    The dramatic rise of oxycodone distribution from the Jupiter Center and sales at the Company's Florida's pharmacies did or should have alerted the Board to the potential that a large portion of the sales have been diverted for illegal use. For example, the Walgreens store in Oviedo, Florida was ranked 444th on that list, filling on average only four oxycodone prescriptions per day in June 2010. In June 2011, it purchased 169,700 pills, an increase of 2,471 percent over 6,600 pills it bought in June 2010. Additionally, one of the Walgreens stores under investigation by the DEA in Fort Myers, Florida went from selling 95,800 units of oxycodone in 2009 to more than 2.1 million units in 2011, which was *67% of all the oxycodone purchased by pharmacists in the same zip code in 2011.* In July 2011, the Florida Surgeon General declared a Public Health Emergency based on statistics that show an average of 7 deaths a day in Florida. Dr. Frank Farmer's , the State Health Officer and Surgeon General, state-wide public health emergency was titled, "State Surgeon General Declares Public Health Emergency Regarding Prescription Drug Abuse Epidemic", the declaration noted that in 2010, 98 of the 100 doctors dispensing oxycodone nationally were in Florida. Additionally, 126 million oxycodone pills were dispensed through the top 100 dispensing pharmacies in Florida; majority of this being through Walgreens.

135.    The Florida Action alleged that Walgreens' Florida pharmacies each ordered more than one million dosage units of oxycodone in 2011—more than ten times the average amount. According to public news reports at the time, in Pasco County, Florida "a Walgreens drug distribution center sold 2.2 million tablets to a single Walgreens' pharmacy in tiny Hudson, a roughly

six-month supply for each of its 12,000 residents." North of Jupiter, Florida, it shipped more than 1.1 million pills to each of two Fort Pierce Walgreens pharmacies. That same year, Florida prescribers wrote more than 60 opioid prescriptions for every 100 Floridians. The Company allowed a single pharmacy in Hudson, Florida – a Pasco County town of 34,000 people – to purchase 2.2 million opioid pills in just one year (2011).

136.    The DEA launched an investigating into Walgreen's distribution center in Jupiter, Florida, the area in which was highly responsible for significant opioid diversion and abuse in Florida. The investigation found that Walgreens' corporate headquarters had pushed to increase the number of oxycodone sales to its Florida pharmacies and provided bonuses for pharmacy employees based on number of prescriptions filled at the pharmacy in an effort to increase oxycodone sales. Driven by the Company's plan to "Focus on Profit," management instructed pharmacists to "look at stores on the bottom end… [and] to make sure we aren't turning legitimate scripts away". In July 2010, Walgreens had ranked all of its Florida pharmacies by number of oxycodone prescriptions dispensed in June of that year and found that the highest-ranking store in oxycodone sales sold almost 18 oxycodone prescriptions per day. All of these prescriptions were filled by the Jupiter Center. Armed with the Company's micro-level data, one high-level Company employee criticized pharmacies that only filled one prescription a day, while praising a pharmacy that filled almost 18 prescriptions a day.

137.    Despite multiple pushes from high-level officials at Walgreens, certain Walgreens employees still raised concerns about the staggering number of oxycodone prescriptions being filled. In an email sent to the corporate manager "Rx Inventory Drug Stores" at Walgreens' headquarters, the Jupiter Center's manager (with overall responsibility for C-II drug operations) stated that she felt that three Florida pharmacies needed to "justify the large quantity" of orders being

filmed. In particular, the manager noted that the Jupiter Center had supplied one pharmacy with 3,271 bottles in a single day period and wonder how the store managed to "even house this many bottle[s]". She also questioned, "How do we go about checking the validity of these orders". The DEA found that the Company did nothing to investigate these valid concerns and instead, the Jupiter Center continued to process the orders.

138.    The Board also ignored direct pleas from Jeffrey Chudnow, Chief of Police, whose jurisdiction included two of the Walgreens pharmacies in question. In March 2011, Chief Chudnow separately wrote identical letters to the then-Chairman of Walgreens, Alan McNally ("McNally") and the Company's Chief Executive Officer Greg Wasson, ("Wasson"), alerting them to the more than 120 arrests he had made for illegal distribution of oxycodone and informing them that the parking lots of the Walgreens in Oviedo, Florida had "become a bastion of illegal drug sales and drug use." McNally and Wasson, and the entire Board, ignored these letters and showed "deliberate indifference on Walgreens' part as to its obligations as a DEA registrant." Notably, these letters came after the chief had written several other letters to the individual pharmacies detailing his concerns and after he had met with senior members of Walgreens' management, including its Market Loss Prevention Manager, to discuss these same problems. According to the DEA, Chief Chudnow's concerns led Walgreens to "take a look at this market… and see if we have an increase in dispensing" – evidence that enhances the plausible inference that the Board knew or should have known of the possible instances of the diversion the DEA later investigated.

139.    As part of the 2013 DEA Settlement Agreement, which followed the investigation, Walgreens pledged to enact and maintain a compliance program to detect and prevent diversion and abuse of controlled substances as required under the CSA and other DEA regulations, which

included procedures to identify the common signs associated with the diversion and abuse of controlled substances at all its retail pharmacies. Walgreens was also required to implement and maintain policies and procedures to ensure that prescriptions for controlled substances were only dispensed to authorized individuals pursuant to federal and state law and regulations.

140.    After the DEA had initiated its Florida regulatory investigation in 2012, Walgreens made presentations to the DEA about its "Controlled Substance Anti-Diversion and Compliance Program" in an effort to "cooperate and avoid litigation," and represented to the DEA that it was making "new changes" to "enhance" its program.[18] However, rather than enhancing its compliance program, internally Walgreens was far more candid, admitting that it only enhanced its program "in an effort to convince DEA that the proposed penalty is excessive….".[19] Further allowing the Company to disobey the Agreement and allowing a space for opioids to be overprescribed in concentrated areas like Florida. Walgreens deliberately structured its anti-diversion measures to avoid reporting to the DEA as required under the law and the April 2011 Settlement. The DEA later characterized this behavior as "deliberate indifference on Walgreens' part as to its obligations as a DEA registrant." Thus, it is reasonable to infer that the Board was aware of the Company's violations.

141.    August 2011, several DEA officials met with Walgreens personnel to discuss Walgreens' sale of oxycodone in Florida. At least ten Walgreens corporate employees were present, including Pinon, Walgreens' in-house counsel. During the meeting, the DEA discussed with Walgreens employees, among other things, that Walgreens pharmacies, particularly in Florida,

---

[18] *See In Re: National Prescription Opiate Litigation*, (Case No. 17-md-2804), Plaintiffs' Memorandum in Opposition to Defendants Walgreens' Motion for Summary Judgment, Exhibit 18 (Dkt. 2205-18), at WAGMDL00659802.

[19] *Id*. at Exhibit 27 (Dkt. 2205-27), at WAGMDL00659270.

sold more oxycodone than most other pharmacies in the country. Despite the contents discussed in this meeting, the Board failed to take steps to further address these issues, leading to the DEA investigations, $80 million fine and additional damages.

142.    Walgreens agreed to maintain a compliance program to "detect and prevent diversion of controlled substances as required under the CSA and applicable DEA regulations" which would "identify the common signs associated with diversion of controlled substances." Walgreens would maintain a "Department of Pharmaceutical Integrity" to coordinate compliance efforts related to controlled substances. The reviewed Addendum included Walgreens' promise to train its pharmacy personnel on the "red flags" of diversion and annually on its "Good Faith Dispensing Policy" related to "changing diversion threats of which Walgreens is aware." Finally, the Addendum required that, beginning in 2014, Walgreens would exclude accounting for controlled substances dispensed at its pharmacies from bonus computations for pharmacists and pharmacy technicians at pharmacies.  The promise in the 2013 DEA Settlement requiring that Walgreens would "direct and train its pharmacists" on their corresponding responsibilities under the CSA was only lip service, as new implementations like the TDGFD checklist were gone unchecked.

143.    Walgreens promised to perform "routine and periodic training of all Walgreens employees responsible for dispensing controlled substances on the elements of the compliance program and their responsibilities under the CSA and applicable DEA regulations", "implement and maintain policies and procedures to ensure that prescriptions for controlled substances are only dispensed to authorized ultimate users pursuant to federal and state law and regulations", "direct and train its pharmacists that their corresponding responsibility under federal law requires them not to fill a prescription that such pharmacist knows or has reason to know was issued for other

46

than a legitimate medical purpose or by a practitioner acting outside the usual course of professional practice." Walgreens implemented a Pilot Program where the pharmacy chain would permanently block doctors who overprescribe certain drugs. However, in an article published by *Law360,* Tasha Polster, Walgreens' vice president of pharmacy quality, compliance and patient safety, testified that "in 2012 she decided to end Walgreens' pilot program under which the pharmacy chain would permanently block doctors who overprescribe certain drugs. She explained that she thought it was more effective to have pharmacists review prescriptions individually." The act of shutting down the Pilot Program violates the Company's agreement to implement and maintain policies and procedures to ensure that prescriptions for controlled substances are only dispensed to authorized ultimate users pursuant to federal and state law and regulations.

144.    Walgreen's instilled, as a result of the DEA investigation, the RX Integrity Group in 2012 purportedly to direct Walgreens' compliance efforts. In fact, Walgreens' compliance efforts were largely for show. Not only did it have no intention of following through on its promised compliance initiatives, but Walgreens also never intended that RX Integrity would do more than superficially limit opioid dispensing, nor would it provide the RX Integrity unit with the necessary resources to perform adequate due diligence for Walgreens' 9,285 pharmacies. Though it was charged with monitoring both its distribution centers and its massive network of 9,285 pharmacies, during much of the Relevant Period, Walgreens' RX Integrity department consisted of fewer than 5 people, and at its height, it only had eleven members.

145.    The content alleged in the Florida Action should have been addressed by the Board as Directors through its strict compliance to the 2013 DEA Agreement. It was not. As the result was the Company's agreement to pay $683 million to settle the Florida Action.

### N. Walgreens Found Liable for Opioid Fueled Epidemic in California

146.     On August 10, 2022, U.S. District Court Charles Breyer ruled that the Company contributed to and is liable for the opioid epidemic in San Francisco, California.

147.     Walgreens is the largest dispenser of opioids in San Francisco. For the past two decades, San Francisco has been battling an opioid epidemic defined by high rates of opioid abuse and addiction. The number of people addicted to opioids in San Francisco has substantially increased over the past years. Since 2016, opioid overdoses have been the leading cause of death among the homelessness in San Francisco. In 2019, the last year of available data, an estimated 40,958 city residents out of a total population of approximately 865,000 suffered opioid addiction.

148.     According to Judge Breyer, at an April 2022 bench trial, the City of San Francisco offered sufficient evidence to show that Walgreens was involved in unreasonable conduct that was a leading factor in the drug-related epidemic in San Francisco. As Judge Breyer ruled:

> The evidence at trial established that from 2006 to 2020, Walgreens pharmacies in San Francisco dispensed hundreds of thousands of red flag opioid prescriptions without performing adequate due diligence. Tens of thousands of these prescriptions were written by doctors with suspect prescribing patterns. The evidence showed that Walgreens did not provide its pharmacists with sufficient time, staffing, or resources to perform due diligence on these prescriptions. Pharmacists experienced constant pressure to fill prescriptions as quickly as possible, and a shortage of resources to review them before dispensing. As a result of Walgreens' fifteen-year failure to perform adequate due diligence, Plaintiff proved that it is more likely than not that Walgreens pharmacies dispensed large volumes of medically illegitimate opioid prescriptions that were diverted for illicit use and that substantially contributed to the opioid epidemic in San Francisco.

149.     Over those 15 years, Walgreens dispensed more than 6 million opioid pills pursuant to prescriptions written by a mere 31 pharmacists in San Francisco. Pharmacists experienced constant pressure to fill prescriptions as quickly as possible, and a shortage of resources to review them before dispensing. Judge Breyer highlighted the testimony of Jeremy Gerspacher, who started working at Walgreens in 2014. Gerspacher testified that Walgreens' due diligence training

"was basically a one-page brochure that you kind of read through and then you check a box in the training module." Gerspacher worked as a floater pharmacist at pharmacies throughout San Francisco. Though he began working at Walgreens "right out of primary school," Gerspacher was the only pharmacist working on his shifts at least 75% of the time. Gerspacher also recalled a specific time when the lack of Walgreens pharmacy training failed him; a customer came in late at night to fill an opioid prescription that presented red flags, and after Gerspacher filled the prescription, he instantly regretted his actions.

150.     Data shows that Walgreens pharmacies in San Francisco dispensed on average 83,420 red flag prescriptions per year from 2006 to 2020. To prove that the Plaintiff's red flag analysis was over inclusive, Walgreens offered evidence that many of these prescriptions written by three doctors who work for San Francisco would trigger larger volumes of red flags; however, this evidence does not undermine Plaintiff's red flags because of the high-risk patient population with whom those three doctors' work. Plaintiff's pharmacy expert, Elizabeth Park, reviewed due diligence materials from Walgreens pharmacies to evaluate the documentation of red flags in the pharmacies. Specifically, Park reviewed the due diligence documentation for 2,265 prescriptions for opioids and opioid cocktails that 12 Walgreens pharmacies in San Francisco dispensed from 2010 to 2019. Based on her review of the due diligence materials produced by Walgreens, Park found "evidence of an appropriate effort to resolve red flags in fewer than 5% of cases." Park found that most of the comment fields in the IC+ system where pharmacists were expected to document their due diligence were blank.

151.     As Judge Breyer concluded in his August 10, 2022, order:

As a result of Walgreens' fifteen-year failure to perform adequate due diligence, it was proven that Walgreens pharmacies dispensed large volumes of medically illegitimate opioid prescriptions that were diverted for illicit use and that substantially contributed to the opioid epidemic in San Francisco. The evidence presented at trial

demonstrated why Walgreens pharmacies failed to perform due diligence before dispensing prescriptions. Walgreens pharmacists repeatedly requested additional staffing to help mitigate these challenges, but Walgreens did not provide it. The evidence showed that Walgreens pharmacies were chronically understaffed. The inadequate resources made it more challenging for pharmacists to perform their duties. Walgreens required its pharmacists to complete paper due diligence check-lists and store them in file cabinets. Its pharmacists had no effective way to share concerns about suspicious prescribers. Their comments regarding suspicious pre-scribing practices were deleted, and they had to resort to keeping "sticky notes" posted in the pharmacy to track prescribers they considered to be suspicious. In this environment, pharmacists "had to cut corners because there was no time."

**O.    Walgreens Has Incurred Substantial Costs as a Result of the Board's Breaches of Fiduciary Duty**

152.    According to Walgreens' June 28, 2013, Form 10-Q for the nine months ending May 31, 2013, "the settlement agreement [with the DEA and DOJ] requires the Company to pay $80 million dollars, which the Company had fully reserved including the $25 million reserve ac-crued in the quarter ended May 13, 2013."

153.    Moreover, according to the June 28, 2013, Form 10-Q, for the nine months ending May 31, 2013, Walgreens' "selling, general, and administrative expenses" increased by $628 mil-lion (from $12.629 billion to $13.259 billion) and "0.2%" of that increase (or approximately $25.258 million) were "costs related to the DEA settlement."

154.    In addition, the June 28, 2013, Form 10-Q states the Walgreens' earnings were negatively impacted "$47 million, $.05 per diluted share, related to a legal settlement with the Drug Enforcement Administration (DEA)."

155.    Taken together, these disclosures suggest that the Company has incurred substantial costs related to its violations in CSA and that the Company had taken substantial reserves over a significant period (apparently more than nine months early) in anticipation of those cost material-izing in a settlement or ruling adverse to the Company.

156.    On June 30, 2022, the Company reported their third quarter highlights which entailed that their "This quarter earnings per share (EPS) from continuing operations decreased 73.8% to $.33, compared with EPS of $1.27 in the year-ago quarter." The Company reported in its fiscal third quarter earnings report that the "third quarter operating loss from continuing operations was $320 million compared to operating income of $1.1 billion in the year-ago quarter… Operating loss in the quarter reflects a $683 million charge related to the opioid settlement with the State of the Florida and higher costs related to the Transformational Cost Management Program."

## V.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

157.    Plaintiff brings this action derivatively in the right of and for the benefit of Walgreens to redress injuries suffered, and to be suffered, by Walgreens as a direct result of the Individual Defendants' breaches of fiduciary duties, as well as the aiding and abetting thereof, by the Individual Defendants. Walgreens is named as a nominal defendant solely in a derivative capacity.

158.    Plaintiff will adequately and fairly represent the interests of Walgreens in enforcing and prosecuting its rights.

159.    Plaintiff has been a continuous shareholder of Walgreens common stock since December 2007 and commits to maintain ownership of Walgreens stock throughout the duration of this litigation.

160.    Plaintiff did not make a pre-suit demand on the Board to pursue this action because such a demand would have been a futile, wasteful and useless act because a majority of the Director Defendants would have been "interested" in (and therefore conflicted from and unable to fairly consider) a demand.

161.    At the time this action was commenced, the Board consisted of the following eleven (11) directors: defendants Pessina, Graham, Murphy, Schlichting, Babiak, Lederer, and non-parties Valerie Jarrett, Tim Wentworth ("Wentworth"), Bryan Hanson, Tom Polen and Inderpal Bhandari.

**A.    Defendant Pessina and Non-Party Wentworth Are Not Independent**

162.    Defendant Pessina's primary occupation throughout the conduct complained of herein was as Walgreen's CEO pursuant to which he has received substantial monetary compensation and other benefits.  Defendant Pessina is also Walgreens' largest shareholder.  Since stepping down from the CEO role, Pessina now serves as the Executive Chairman of the Board.

163.    Non-Party Wentworth is the current CEO of Walgreens and is therefore not independent.  Given his current role, the Board must formally classify him as such under NASDAQ listing standards.  According to the Company's Proxy Statement filed on Schedule 14A with the SEC on December 8, 2021, Pessina is not independent under NASDAQ listing standards.

**B.    Most of the Board Faces a Substantial Likelihood of Liability**

  1.    Defendants, Babiak, Graham, Lederer and Schlichting Served as Directors when the Company Entered into the 2013 DEA Settlement

164.    Defendants Babiak, Graham and Schlichting each served as directors in 2013 when the Company announced the 2013 DEA Settlement.

165.    As alleged herein, during the Relevant Period, the Board implemented and oversaw a business strategy that resulted in widespread and repeated violations of the law. Breaking the law, and breaching agreements with the DEA, is not a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment. Accordingly, demand on the Board is excused.

166.     A derivative claim to recoup damages for harm caused to the Company by unlawful activity represents a challenge to conduct that is outside the scope of the Board's business judgment – conduct for which the Board may face potential personal liability.

167.     Walgreens' history of non-compliance with drug diversion and reporting laws, knowledge of the opioid epidemic and DEA fines render this derivative action distinct from most other corporate boards. The Board was made uniquely accountable and responsible for monitoring and reporting under the 2013 DEA Settlement. The Board's failure to carry out the obligations and responsibilities under the 2013 DEA Settlement and permitting Walgreens to repeatedly violate the drug diversion and reporting laws as a business strategy, cannot be regarded as a valid exercise of business judgment. For these reasons, demand on the Board is futile and excused.

168.     By virtue of their service on the Board when the Company entered the 2013 DEA Settlement, Defendants Babiak, Graham and Schlichting were aware of the 2013 DEA Settlement, yet they ignored their obligations to cause Walgreens to abide by those obligations.

  2.    The Audit Committee Defendants Face a Substantial Likelihood of Liability

163.     The Audit Committee Defendants, Babiak, Graham, and Schlichting face additional liability because of their service on the Board's Audit Committee during the Relevant Period.

164.     When pressured by stockholders to publicly outline the governance scheme designed by Walgreens to ensure compliance with the 2013 DEA Settlement and other regulatory settlements, the Board published the 2019 Oversight Report.

165.     The 2019 Oversight Report clearly and explicitly states that the Board's Audit Committee maintains responsibility for the "oversight of legal and compliance matters relevant to the Company, including legal and compliance matters related to prescription opioids." The Audit Committee Defendants violated their fiduciary duties to act in good faith to address the violations of law complained of herein.

## COUNT I

### Breach of Fiduciary Duty Against All Individual Defendants

166. Plaintiff incorporates by reference and realleges each allegation set forth above, as though fully set forth herein.

167. The Individual Defendants all owed and owe fiduciary duties to Walgreens. By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Walgreens the highest obligation of good faith and loyalty in the administration of the affairs of Walgreens, including assuring that Walgreens complied with federal laws governing, among other things, the Company's regulatory obligations with the DEA.

168. The Individual Defendants also had an affirmative obligation to maintain and enforce the controls agreed to in the 2013 DEA Settlement.

169. The Individual Defendants willfully ignored their obligations, Walgreens' internal controls and numerous warnings and government investigations and inquiries specifically relating to failure to address rampant misconduct in the Company's pharmacies. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their recurrence.

170. Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties about prudently managing the business of Walgreens in a manner consistent with the duties imposed upon them by law.

171. By committing the misconduct alleged herein, Individual Defendants breached their duties of due care, diligence and loyalty in the management and administration of Walgreens' affairs and in the use and preservation of Walgreens' assets.

172. As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary obligations, Walgreens has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

173. As a result of the misconduct alleged herein, Defendants are liable to the Company.

## COUNT II

### Unjust Enrichment Against All Individual Defendants

174. Plaintiff incorporates by reference and realleges each allegation set forth above, as though fully set forth herein.

175. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Walgreens. The Individual Defendants were unjustly enriched as a result of the compensation and remuneration they received while breaching fiduciary duties owed to the Company.

176. Plaintiffs, as shareholders and representatives of Walgreens, seek restitution from the Individual Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

177. Plaintiffs, on behalf of Walgreens, have an inadequate remedy at law.

## COUNT III

### Violations of Section 14A of the Securities Act of 1934 Against All Individual Defendants

178. Plaintiffs incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

179. Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, the Company's 2018 Proxy Statement and 2019 Proxy Statement violated §14(a) and Rule 14a-9 because it falsely described the

efforts taken by the Individual Defendants to accurately insulate the Company from the risk associated with its role in the opioid epidemic.

180.     In the exercise of reasonable care, defendants should have known that the statements contained in the proxy statement were materially false and misleading.

181.     The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement.  The proxy statement solicited and obtained shareholder votes for: (i) director nominees and (ii) executive compensation.

182.     The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.     Directing Walgreens to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.     Awarding to Walgreens restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Respectfully submitted,

Dated: November 3, 2023

By: */s/ Matthew T. Hurst*
**HEFFNER HURST**
Matthew T. Heffner
*mheffner@heffnerhurst.com*
Matthew T. Hurst
*mhurst@heffnerhurst.com*
30 North LaSalle, Suite 1210
Chicago, Illinois 60602
Telephone: (312) 346-3466

*Local Counsel for Plaintiff*

**THE WEISER LAW FIRM, P.C.**
Robert B. Weiser
*rweiser@weiserlawfirm.com*
James M. Ficaro
*jficaro@weiserlawfirm.com*
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
West Conshohocken, PA  19428
Telephone: (610) 225-2677
Facsimile: (610) 408-8062

**RM LAW, P.C.**
Richard A. Maniskas
*rmaniskas@rmclasslaw.com*
1055 Westlakes Drive, Suite 300
Berwyn, PA  19312
Telephone: (484) 324-6800
Facsimile: (484) 631-1305

*Counsel for Plaintiff*

15959869